Christopher A. Seeger, Esq. (CS-4880)
SEEGER WEISS LLP
One William Street
New York, NY 10004
Tel: 212.584.0700
Fax: 212.584.0799

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| EDGAR HOLOMON, individually and on behalf of all other persons similarly situated, | CASE NO.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| S.A.C. CAPITAL MANAGEMENT, LLC, S.A.C. CAPITAL ADVISORS, LLC, S.A.C. CAPITAL ASSOCIATES, LLC, S.A.C. HEALTHCO FUNDS, LLC, SIGMA CAPITAL MANAGEMENT, LLC, STEVEN A. COHEN, EXIS CAPITAL MANAGEMENT, INC., EXIS CAPITAL, LLC, EXIS DIFFERENTIAL PARTNERS, L.P., EXIS INTEGRATED PARTNERS, L.P., ADAM D. SENDER, SPYRO CONTOGOURIS, MAX BERNSTEIN, ANDREW HELLER, ROCKER PARTNERS, L.P., COPPER RIVER PARTNERS, L.P., DAVID ROCKER, THIRD POINT LLC, DANIEL S. LOEB, JEFFREY PERRY, MORGAN KEEGAN & COMPANY, INC., and JOHN D. GWYNN, | |
| Defendants. | |

Plaintiff EDGAR HOLOMON, individually and on behalf of all other persons similarly situated, by his undersigned counsel, for this securities stock manipulation class action complaint, alleges the following upon personal knowledge as to himself and his own acts and

upon information and belief as to all other matters based upon the investigation made by and through his counsel, which investigation included, among other things, a review of the public documents, analyst reports issued by various defendants, public stock charts for Fairfax Financial Holdings Limited ("Fairfax" or the "Company") and information obtained for a complaint filed in New Jersey by Fairfax against some of the same defendants.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of himself and all other persons who sold the shares of common stock of Fairfax over the New York Stock Exchange ("NYSE") between December 18, 2002 and July 25, 2006 (the "Class Period"), and were damaged thereby (the "Class"), seeking to pursue remedies under the federal securities laws, including Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and SEC Rule l0b-5, 17 C.F.R. § 240.l0b-5 promulgated thereunder.

2.      This action arises from a massive, illegal stock market manipulation scheme that was based on Defendants false and misleading statements (the "scheme").  At great profit to, inter alia, defendants S.A.C. Capital, Exis Capital, Third Point, Rocker Partners, the defendants' scheme targeted and severely harmed shareholders of Fairfax, including Plaintiff and the Class, who sold their shares at depressed values based upon the false, misleading and manipulative statements that were part of defendants' scheme.

3.      Based on information and belief and without discovery, this scheme involved, inter alia,: (i) defendants' accumulation of substantial short positions (15-20% of Fairfax's stock) so that they would substantially benefit from declines in Fairfax's stock price; (ii) Defendants' dissemination of false and misleading statements to the market intended to manipulate down Fairfax's common stock price and publication of research reports which were falsely represented

2

to be objective when in fact, the reports were biased, contained false and misleading statements, and designed to negatively impact Fairfax's stock price in furtherance of Defendants' scheme to manipulate Fairfax's stock price. Moreover, Defendants engaged in naked short selling with the intent to further manipulate Fairfax stock price by among other things: intentionally failing to deliver securities to put downward pressure on the stock by flooding the market with phantom shares; causing oversupply of shares and further depressing their price; and abusing the option market maker exception for the purpose of avoiding compliance with Regulation SHO.

4. Defendant S.A.C. Capital Management, founded and run by Steven A. Cohen, and its affiliates (collectively, "S.A.C. Capital" or S.A.C."), are at the center of the manipulation scheme, along with other hedge funds, including S.A.C.'s spin-offs Exis Capital, Third Point and Rocker Partners. These hedge funds have immense power in the financial markets because of their assets and trading volume. For example, Cohen through his control over and interests in S.A.C. Capital and other hedge funds, personally controls at least $7 billion in capital invested in the markets. Cohen's companies' trading activity regularly accounts for 3% of the daily trading volume on the New York Stock Exchange ("NYSE").

5. Plaintiff Holomon is a former Fairfax shareholder who sold his stock at a depressed price during the class period as a result of defendants' manipulation scheme. Fairfax is an insurance and financial services company operating in Canada and the United States, including through its New York subsidiaries Seneca Insurance Company, Inc., and Hudson Specialty Insurance Company. Fairfax's stock was particularly vulnerable to Defendants' scheme because it is thinly traded relative to other similar companies. Together with its operating divisions, Fairfax employs almost 8,000 people worldwide, owns over $27.5 billion in assets and has earned $5.9 billion in revenue in the fiscal year ended December 31, 2005. The

3

common stock of Fairfax is publicly traded on the Toronto Stock Exchange and the New York Stock Exchange under the symbol "FFH." As of December 31, 2005, there were 17,056,856 subordinate voting shares and 1,548,000 multiple voting shares of Fairfax common stock outstanding. Fairfax stock is held by investors throughout the United States and Canada.

      6.      Beginning in or about December 2002, after Fairfax's stock was listed on the NYSE, S.A.C. Capital, Exis Capital and the other defendants launched a manipulation scheme – which the defendants themselves referred to as the "Fairfax Project" – which was an abusive short selling strategy coupled with a public relations campaign chalked full of false and misleading statements about Fairfax, its executives, its business, and its common stock price designed to drive down the Company's stock price. In furtherance of their scheme, defendants, after having taken short positions in Fairfax stock, engaged in an manipulative scheme to drive down Fairfax's stock price by, among other things:

- Disseminating false and misleading information to the stock markets and the public through purportedly independent analyst reports, statements to the financial press, and the wholesale manufacture of false information about Fairfax's accounting and business;

- Disseminating false and misleading information concerning Fairfax directly to those most critical to Fairfax's business, including its employees, executives, shareholders, bankers, regulators; rating agencies; brokers; analysts; and the media;

- Engaging in a long-term campaign of personal harassment and intimidation of present and former employees, executives and shareholders of Fairfax, including personal attacks delivered to executives' clergy and family members;

- Attempting to instigate regulatory investigations of Fairfax by providing false and misleading information and documentation to regulatory agencies; and

- Engaging in short selling tactics in violation of anti-manipulative rules and regulations.

7.     Defendants' false and misleading statements about Fairfax were aimed at depressing the value of its stock so that the short-selling defendants could cover their short positions and profit from the resulting decline in Fairfax's stock price at the expense of selling shareholders, including plaintiff and the Class.

8.     Moreover, at those times since December 2002 when Fairfax's stock price recovered based on, inter alia, Fairfax's positive business results, defendants intensified their manipulation scheme by, inter alia, disseminating additional false statements, including, for example, misrepresentations that Fairfax's CEO had absconded with stolen company funds and was being pursued by the Royal Canadian Mounted Police.

9.     Defendants' manipulative and fraudulent scheme brought about their intended result, which was suppressing Fairfax's stock price.

## JURISDICTION AND VENUE

10.     The claims alleged herein arise under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

11.     The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§1331 and 1337. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the dissemination to the investing public of the false and misleading statements at issue, occurred in substantial part in this District. Moreover, Defendants conduct substantial business in this District. In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## THE PARTIES

12.     Plaintiff Holomon resides in Dallas, Texas.  On or about November 16, 2005, plaintiff sold his 21 shares of the common stock of Fairfax at the price of $145.64 per share.

13.     Defendants S.A.C. Capital Management and S.A.C. Capital Advisors, operate and manage, directly or indirectly, various hedge funds (including defendants S.A.C. Healthco and Sigma Capital Management, LLC), are organized under the laws of Delaware; S.A.C. Capital Advisors maintains its principal places of business at 72 Cummings Point Road, Stamford, Connecticut.  S.A.C. Capital Management maintains its principal places of business at 540 Madison Avenue, New York, New York.

14.     Defendant S.A.C. Capital Associates, LLC, and S.A.C. Healthco are hedge funds organized under the laws of Anguilla, British West Indies, with their principal places of business at 540 Madison Avenue, New York, New York.

15.     Defendant Sigma Capital Management, LLC is a hedge fund organized under the laws of Delaware, with its principal place of business at 540 Madison Avenue, New York, New York.

16.     Defendant Cohen resides at 30 Crown Lane, Greenwich, Connecticut.  Cohen founded and, directly or indirectly, owns, controls and manages S.A.C. Capital Associates, S.A.C. Capital Management, S.A.C. Capital Advisors, Sigma, S.A.C. Healthco (collectively with Cohen, the "S.A.C. Defendants") and various other hedge funds.  Cohen controls, dominates, and operates S.A.C. Capital without regard to their putatively separate legal form and existence, such that each is the alter ego of the others and of Cohen.  In addition, as set forth herein, Cohen and S.A.C. Capital abused the corporate form by using the entities they control and operate to perpetrate a fraud and injustice.

6

17.     Defendant Exis Capital Management is a corporation organized under the laws of Delaware, with its principal place of business at 875 Third Avenue, New York, New York.

18.     Defendant Exis Capital is a limited liability company organized under the laws of Delaware, with its principal place of business at 875 Third Avenue, New York, New York.

19.     Defendant Exis Differential is a limited partnership organized under the laws of Delaware, with its principal place of business at 875 Third Avenue, New York, New York.

20.     Defendants Exis Integrated is a limited partnership organized under the laws of Delaware, with its principal place of business at 875 Third Avenue, New York, New York.

21.     Defendant Sender is a co-founder of Exis Capital Management.  Sender resides at 109 Greene Street, New York, New York.

22.     Defendant Contogouris is an employee of Exis Capital Management. Contogouris resides at 12 East 78th Street, New York, New York.

23.     Defendant Bernstein is an employee of Exis Capital Management.  Bernstein resides at 401 East 34th Street, New York, New York.

24.     Defendant Heller is the Chief Executive Officer of Exis Capital Management. Heller resides at 200 East 66th Street, New York, New York.  Defendants Exis Capital Management, Exis Capital, Exis Differential, Exis Integrated, Sender, Contogouris, Bernstein and Heller are collectively referred to as the "Exis Defendants."

25.     Defendant Rocker Partners is a limited partnership organized under the laws of New York, with its principal place of business at 374 Millburn Avenue, Millburn, New Jersey.

26.     Defendant Copper River, is the successor to Rocker Partners, and is organized under the laws of New York, with its principal place of business at 374 Millburn Avenue, Millburn, New Jersey.

7

27.     Defendant Rocker was, during times relevant to the complaint, the primary owner and manager of Rocker Partners.  Rocker resides at 43 Minnisink Road, Short Hills, New Jersey.  Defendants Rocker Partners, Copper River and Rocker are collectively referred to as the "Rocker Defendants."

28.     Defendant Third Point is a limited liability company organized under the laws of Delaware, with its principal place of business at 390 Park Avenue, New York, New York.

29.     Defendant Loeb is the Chief Executive Officer of Third Point.  Loeb resides at 7 MacDougal Alley, New York, New York.

30.     Defendant Perry is an employee of Third Point.  Perry resides at 9 Wayside Lane, Scarsdale, New York.  Defendants Third Point, Loeb and Perry are collectively referred to as the "Third Point Defendants."

31.     Defendant Morgan Keegan is a corporation organized under the laws of Tennessee, with its principal place of business at 50 Front Street, Memphis, Tennessee.

32.     Defendant Gwynn is an employee of Morgan Keegan.  Gwynn resides at 2205 Poplar Drive, Memphis, Tennessee.  Defendants Morgan Keegan and Gwynn are together referred to as the "Morgan Keegan Defendants."

## STATEMENT OF FACTS

33.     This action arises from a massive, illegal stock market manipulation scheme that has targeted and severely harmed plaintiff and the Class, among other shareholders of Fairfax, and has resulted in immense ill-gotten profits for defendants S.A.C. Capital, Exis Capital, Third Point, Rocker Partners and other extremely powerful hedge funds.

34.     As it relates directly to Fairfax and its shareholders, the scheme – dubbed the "Fairfax Project" – involved the concerted efforts of a group of hedge funds, purportedly

8

independent analysts, and their cohorts, who engaged in an organized effort to deliberately depress the price of the Fairfax stock and benefit from it by, among other things:

- disseminating false and misleading information through purportedly independent analyst reports, false and misleading statements to the financial press, and the false statements about Fairfax's accounting and business issues;

- disseminating false and misleading information concerning Fairfax directly to Fairfax's employees, executives, shareholders, bankers, and rating agencies;

- attempting to instigate regulatory investigations of Fairfax by providing false and misleading information and documentation to regulatory agencies;

- engaging in a campaign of harassing present and former employees, executives and shareholders of Fairfax; and

- engaging in manipulative short selling, "short equivalent" trading strategies and abusive "naked short selling" of Fairfax stock;

35. Defendants' manipulation scheme resulted in significant profit from the resulting diminution in value of the Fairfax stock held by plaintiff and the Class by short-selling Fairfax's publicly traded securities -- that is, by taking positions in those securities that would be profitable only if Fairfax's stock price declined, and then causing that decline through negative publicity and false statements. A "short seller" borrows stock from a lender and sells the borrowed stock, expecting that the price of the stock will decline, and that he will therefore be able to purchase the stock later at a lower price, return the stock to the lender and keep the profit. Defendants' scheme also employed various "short-equivalent" trading strategies -- such as the purchase of "put" or "swap" options -- that likewise profited from future declines in the stock price of targeted companies.

36. In furtherance of their scheme, defendants also engaged in the so-called "naked short selling." "Naked short selling . . . refers to selling short without having borrowed the

security to make delivery." Securities Exchange Act Release No. 50103, 69 FR 48008, 48009 n.10 (Aug. 6, 2004). According to the Securities and Exchange Commission (the "SEC"), "[n]aked short selling can have a number of negative effects on the market, particularly when the fails to deliver persist for an extended period of time and result in a significantly large unfulfilled delivery obligations." Securities Exchange Act Release No. 48709, 2003 WL 22461522, at *6 (Oct. 28, 2003). One of the more significant negative effects observed by the SEC is the fact that "naked short sellers enjoy greater leverage than if they were to borrow securities and deliver within a reasonable time, and they may use this additional leverage to engage in trading activities that deliberately depress the price of a security." Id.

37.    Naked short selling can result in significant and persistent failures to deliver securities to the buyers, which further depresses the stock price. A persistently large number of "fails to deliver" creates immense downward price pressure because it increases a supply of the stock by diluting the market with phantom -- i.e., sold but undelivered -- shares. Defendants' naked short selling was so widespread and sustained that it has resulted in the Fairfax stock being listed continuously on the NYSE list of "threshold securities" with substantial and persistent fails to deliver for all but two months (in mid-2005) since January 2005, when the list was instituted. During the same period, the short interest in Fairfax shares represented approximately 25% of all shares outstanding and accounted for 35% of Fairfax's NYSE trading volume.

38.    The SEC has recognized that "[s]elling short without having stock available for delivery and intentionally failing to deliver stock within the standard three-day settlement period can be market manipulation." SEC Chairman Christopher Cox, July 12, 2005. Accordingly, the SEC Regulation SHO adopted in 2004 generally prohibits naked short selling. Regulation SHO was promulgated to "reduce short selling abuses" and "as means to address potential

manipulation through so-called 'naked' short selling." Securities Exchange Act Release No. 50103, 69 FR 48008, 48014 n.53.

39.    Regulation SHO contains a "narrow exception" for market makers and specialists. Securities Exchange Act Release No. 48709, 2003 WL 22461522, at *8. This "narrow exception" is available "only in connection with bona-fide market making activities." Securities Exchange Act Release No. 50103, 69 FR 48008, 48015. Significantly, "bona fide market making does not include transactions whereby a market maker enters into an arrangement with another broker-dealer or customer in an attempt to use the market maker's exception for the purpose of avoiding compliance with [Regulation SHO] by customer." Id.

40.    Upon information and belief, defendants abused naked short selling with intent to further Fairfax stock manipulation scheme by: (i) using the leverage of not having to locate and borrow shares to engage in trading activities that deliberately depressed the price of Fairfax stock; (ii) intentionally failing to deliver securities in order to put further downward pressure on the stock by flooding the market with phantom shares, thus causing oversupply of shares and further depressing their price; (iii) abusing the option market maker exception for the purpose of avoiding compliance with Regulation SHO; and (iv) using naked short selling to establish large short positions in Fairfax without generating price spikes, due to the extremely low number of shares actually borrowed for shorting.

41.    By depressing the value of Fairfax stock through market manipulation, the scheme inflicted enormous financial harm on the investors in Fairfax, including plaintiff and the Class, who sold their shares of Fairfax stock at artificially depressed prices.

## A. The Fairfax Project

### 1. The S.A.C. Defendants

42.     The S.A.C. hedge funds derive their names from the initials of their founder and leader Steven A. Cohen. Cohen is known in the industry as the "most powerful trader on Wall Street you've never heard of" because of the "highly secretive and stupendously successful S.A.C. funds he controls." Through S.A.C. Capital, Cohen controls no less than $7 billion and regularly accounts for 3% of the NYSE daily volume and 1% of the NASDAQ daily volume. These investment dollars are channeled through several different "portfolio companies" or funds -- including a core fund, a global diversified fund, a health-care fund, and defendant Sigma fund (comprised of Cohen's personal monies), all of which Cohen manages in a highly integrated and hands-on fashion.

43.     Cohen's market influence, however, extends much further than the S.A.C. funds he directly controls. In addition to the billions he controls directly through those funds, he has also invested billions more in non-S.A.C. funds, including funds formed by former S.A.C. managers who are required to agree as a condition of S.A.C. employment to permit Cohen to hold up to a 50% interest in any hedge funds they form after leaving S.A.C. Through such "satellite" fund investments, Cohen is better able to mask his trading strategies and the frequent market manipulation employed in executing those strategies. Consequently, Cohen personally has one of, if not the, most powerful market-moving capabilities on Wall Street.

44.     In the first 12 years since he formed S.A.C. Capital Advisors, Cohen had regularly generated incredible returns in the range of 40% per annum. Reflecting this extraordinary performance, investors pay him a 50% success fee, far above the 20% industry standard. As a result, Cohen's annual S.A.C. management fee regularly has exceeded $400

million, which is in addition to profit he earns on his own monies invested in Sigma and other S.A.C. and non-S.A.C. funds.

45.    Unlike most hedge funds, S.A.C. seeks no volume discount on its enormous trading costs and commissions, and consequently pays over $150 million in annual commissions -- making it one of Wall Street's top ten trading customers.  In addition, S.A.C. frequently purchases secondary offerings, that include substantial built-in brokerage commissions for banks, and thereby further increases S.A.C.'s already substantial financial leverage and influence. Cohen uses this enormous financial leverage to support S.A.C.'s trading strategies by demanding access to material non-public information from financial institutions with whom S.A.C. does business, including non-public inside information concerning public companies and other clients to whom those institutions owe fiduciary and other duties of non-disclosure, and the substance and timing of reports and recommendations being issued by analysts for those institutions. Financial institutions and their employees understand -- because S.A.C. has told them -- that a failure to provide such information will result in the loss of S.A.C.'s substantial business.

46.    S.A.C. uses its enormous financial leverage to not only extract and trade on material non-public information but also to actually dictate the substance and timing of certain material information being disseminated to the market.  For example, S.A.C. regularly uses its substantial financial leverage to direct and influence the analysis and recommendations of purportedly independent stock analysts and the time such analysis and recommendations are issued to the market, without any disclosure of the material conflict of interest reflected by its leverage and influence.  Like S.A.C.'s demand for material non-public information, it is now simply understood in the industry that failing to provide influence and control over the substance and timing of analyst reports will result in the loss of S.A.C.'s substantial business.

13

47.    S.A.C. directly or through its affiliates or satellite funds is an important Morgan Keegan client, and Gwynn collaborates closely with S.A.C., including with Steven Cohen, whom he speaks with directly both in person and in more frequent telephone communications.

48.    Defendants Cohen exercised actual control over and participated in manipulative activities of other defendants by, among other things, paying defendant Contogouris and his associates and operatives for their efforts in disseminating false and damaging information about Fairfax; by orchestrating and directing defendants' misinformation campaign against Fairfax; by receiving periodic reports about the campaign's progress; and by coordinating defendants' manipulation of Fairfax stock and their misinformation efforts for the benefit of the defendants and to the great detriment of the Fairfax shareholders, including plaintiff and the Class.

49.    To maximize the impact of its access to material non-public information and control and influence over the substance and timing of analyst reports, S.A.C. focuses on stocks with valuations easily influenced by market information such as thinly traded stocks, small to modestly capitalized stocks, and stocks in volatile sectors.  S.A.C. rarely invests in such companies long-term but instead pursues short-selling or event-driven trading strategies based on S.A.C.'s access to -- and control over -- material non-public information, and the substance and timing of stock analyst reports.

50.    To maximize the use of S.A.C.'s substantial market influence, under Cohen's direction, S.A.C. also places extreme pressure on its traders, managers, employees, and agents to produce at all costs.  S.A.C. generates such intense pressure by, among other things, imposing what is described internally at S.A.C. as an "eat what you kill" compensation scheme under which compensation depends on individual trading performance and not -- as is the industry norm -- on the fund's overall performance.  Those who fail to produce are quickly terminated:

14

"At S.A.C., you either perform or you're dead," according to one public report by an insider. Such policies ensure that those who remain at S.A.C. are willing and capable of doing whatever it takes to secure the extraordinary performance Steven Cohen demands. The enormous pressure to perform at S.A.C. was particularly acute in 2003 after Cohen had experienced what insiders called his "very disappointing" 14% returns and $100 million in management fees in 2002.

51. During the Class Period, the S.A.C. Defendants orchestrated short-selling "bear attacks" on numerous publicly traded companies, including Fairfax. They prosecuted these attacks on Fairfax and other targeted companies by, among other things, paying, pressuring, and otherwise influencing purportedly independent analysts and others working with S.A.C. to disseminate materially false and misleading information about the business, accounting, and corporate governance of these targeted companies. These materially misleading misinformation campaigns in coordination with manipulative short-selling devastated the value of Fairfax stock to the enormous benefit of the short-selling hedge fund defendants and the extreme detriment of the companies and their legitimate investors, including plaintiff and the Class.

52. The financial firms and associated analysts with which S.A.C. regularly does business directly, and indirectly through Cohen's satellite funds, include defendants Morgan Keegan and Gwynn. As a result of S.A.C.'s frequent communications with Morgan Keegan and Gwynn, S.A.C. learns when Gwynn intends to issue reports and what they will say and, indeed, frequently directs Gwynn on when to issue reports and what to say.

### 2. The Exis Defendants

#### i. Defendant Sender

53. In 1998, Sender and Ken Lissak, highly successful S.A.C. traders and senior Cohen lieutenants, left S.A.C. to form hedge fund Kadem Capital ("Kadem"). Like S.A.C., Kadem charged a 50% success fee, concentrated its focus on short-selling, used trading and other

financial leverage to influence the substance and timing of market moving analyst reports, and used purportedly "custom" research reports in order to disseminate its own views supportive of its trading positions disguised as independent and unbiased research.

54.    In its first four years, Kadem enjoyed average annual returns in excess of 30%. At the end of 2001, Sender bought out Lissak's interest in Kadem and changed the name to Exis Capital Management. By late 2003, Exis was managing over $1.5 billion and pursued high-risk trading strategies, including in high-risk illiquid positions such as concentrated short-selling bets. S.A.C. and Cohen also are investors, directly and indirectly, in Exis, and Sender and Cohen collaborate in carrying out attacks on companies in whose stock they have taken short positions. Also like S.A.C., Exis is a significant client of Morgan Keegan and has substantial influence over Gwynn, with whom Exis also collaborates closely.

55.    However, beginning in December 2003, Exis suffered staggering losses, massive investor redemptions and personnel defections as a result of a concentrated short position in BlackBerry-maker Research in Motion ("RIM") when that company's stock price jumped 50% on December 23 and continued to increase over the next six months. By June 2004, Exis had shrunk to a $700 million fund and was struggling to retain its remaining investors. To salvage his reputation and business, Sender blamed Kenneth Grant, also formerly of S.A.C., for this investment debacle. Although Exis survived, the fund suffered for years as investors went elsewhere. Accordingly, it was critical to Exis's continued survival that there be no such additional short-selling disasters.

56.    According to published reports, Sender employs persons who utilize "unorthodox methods" to "get the job done." For example, in connection with a failed investment, Sender retained the now incarcerated private detective Anthony Pelicano to "ensure that Sender got his

16

money back." As part of that effort, Pelicano engaged in illegal wiretapping that Sender knew about, and knew was illegal, but did nothing to stop. Likewise, as set forth more fully below, when Sender faced catastrophic short-selling losses in Fairfax stock, he turned to another shadowy operative who utilized "unorthodox" and illegal methods to drop the price of stocks his clients had sold short.

57.     Defendant Heller grew up with Sender, who later appointed him the Chief Executive Officer of Exis. Along with Sender, Heller approved, managed, and participated in the illegal short-selling activities against Fairfax that are described in detail below.

### ii.     Defendant Contogouris

58.     Spyro Contogouris is an operative for short-selling hedge funds that pay him to drive down the price of stocks in which they have large short positions and otherwise to secure material non-public information on which they trade. To secure this objective, Contogouris disseminates materially false, misleading, and unfounded disinformation about target companies to their employees, shareholders, analysts, partners, customers, and other important constituencies. This dissemination occurs through, among other things, (a) anonymous or misrepresented telephone calls, e-mails and personal communications; (b) stock research reports Contogouris prepares and circulates without disclosing -- as required by law -- his financial relationship with persons shorting that stock; (c) stock research reports prepared by third-parties who were paid or otherwise influenced to support short-sellers; (d) orchestrating stories in the media based on such disinformation; and (e) a sham litigation filed for publicity purposes.

59.     In addition to disseminating disinformation, Contogouris plans and directs manipulative trading activity, attempts to instigate regulatory and law enforcement investigations, and interferes with the target's business by harassing, threatening, intimidating,

17

and distracting its employees, officers, directors and critical business relations. Through this same approach to market insiders, Contogouris attempts to elicit material inside information.

60.     Contogouris worked for and was compensated by or on behalf of various defendants, including but not limited to Cohen, Exis, S.A.C., and Third Point, not only to drive down the price of Fairfax stock (as well as other stocks) but to "bring down Fairfax" itself. Cohen, as well as Exis and Third Point, maintained close contacts with Contogouris through meetings, telephonic conversations and/or email exchanges, directing the defendants' misinformation efforts against Fairfax and coordinating those efforts with their stock manipulation activities. As part of his work on Fairfax, Contogouris relocated to New York City and with his cohort Max Bernstein operated out of Exis's New York offices where they each had their own desks and phones. At times Contogouris and Bernstein identified themselves as Exis employees, at other times they represented that they were employees of a sham entity called MI4 Reconnaissance, at other times they conflated the two by, for example, delivering business cards associating them with MI4 Reconnaissance but listing as their phone number the Exis phone number, and at still other times they identified themselves with aliases and false personas. Contogouris claims that he uses aliases and false personas to preserve his ability to deny his activities if ever forced to testify about such events -- that is, to preserve his ability to commit perjury.

61.     Contogouris traveled frequently in support of the defendants' objective and was in regular discussions concerning his activities with, among others, Cohen, Sender, Heller, Third Point,   Perry, S.A.C., Gwynn, Bernstein and other defendants.   Contogouris pursued the defendants' objectives aggressively by, among other things:

- Relentlessly disseminating highly misleading disinformation about Fairfax and Prem Watsa, Fairfax's Chief Executive

18

Officer and Chairman of the Board, to employees, shareholders, analysts, rating agencies, auditors, journalists, and regulators via, among other means, e-mail, bogus or corrupted "research" reports, internet chat boards, a defamatory "Prem Watsa" website, and in personal meetings and telephone calls;

- Harassing and intimidating senior executives, their staffs, and their families through anonymous or misrepresented communications, including communications or unsolicited "meetings" with Watsa's executive assistant, Pastor, family, and others;

- Misappropriating material non-public information for the purpose of supporting the defendants' trading strategy and attempting to coerce insiders into cooperating with him; and

- Orchestrating negative analyst coverage -- particularly through Gwynn, as well as through MI4 Reconnaissance reports -- and news as well as manipulative trading activity in Fairfax stock.

62.     Contogouris has been the subject of numerous litigations, been judicially removed from fiduciary positions for abuses, and has been sanctioned in the past by courts for contemptible conduct.

63.     On November 13, 2006, Contogouris was arrested by the FBI on a wire fraud charge for defrauding his former employer of over $5 million. If convicted, Contogouris faces a maximum penalty of 20 years' imprisonment and a substantial monetary fine.

### iii.     Defendant Bernstein

64.     Max Bernstein is a hedge fund operative who works with Contogouris. Like Contogouris, Bernstein operates under various aliases and is and was responsible for implementing much of the defendants' intimidating, harassing, and defaming conduct against Fairfax in an effort to drive down its stock price, including the transmission of highly defamatory and threatening communications and associated materials to Watsa's Pastor, his assistant, Fairfax's shareholders, analysts, and rating agencies.

19

### 3.    The Third Point Defendants

65.    Third Point is a $4.3 billion hedge fund based in New York City that is run by Loeb.  Perry is a senior advisor at Third Point.  From 2003 to 2005, Perry was the co-manager with Jim Chanos at short-selling fund Kynikos Associates, Ltd., and from 2001-2003 was a senior portfolio manager at S.A.C. Capital Advisors.  Perry worked and continues to work closely with Contogouris in disseminating disinformation about Fairfax, including orchestrating negative press reports, republishing those negative press reports to Fairfax's shareholders, analysts, rating agencies, and others, and attempting to instigate regulatory investigations of Fairfax.

### 4.    The Rocker Defendants

66.    David Rocker was during times relevant to the complaint the primary owner and manager of hedge fund Rocker Partners operating in Millburn, New Jersey.  Like S.A.C., a cornerstone of Rocker Partners success is its ability regularly to influence and direct the substance and timing of analyst research -- both so-called "independent" and brokerage-based research -- to support Rocker Partners short positions.  Rocker is also a substantial shareholder in the financial news and commentary website TheStreet.com and other hedge funds and former colleagues have publicly praised his "uncanny ability to entice a select number of journalists to do negative stories on his short sales time and time again," which those familiar with Rocker describe as "a key reason for his success."

### 5.    The Morgan Keegan Defendants

67.    Morgan Keegan is a mid-sized investment bank based in Memphis, TN and a subsidiary of Regions Financial Corp.  Gwynn is an equities research analyst at Morgan Keegan focused on the insurance industry.  In 1985, Gwynn started an investment company called First Coast Capital with a partner Willis Ball.  In 1993, First Coast Capital failed and two years later

Gwynn filed for personal bankruptcy. Over the course of the next several years Gwynn worked as a research analyst for the Colorado office of a small securities firm, Montag & Joselson. In 2002 -- with the help of certain connections to powerful hedge funds with whom he had developed a relationship -- he became an insurance industry research analyst at Morgan Keegan, which was itself dependent on hedge fund business.

68.     Morgan Keegan's brokerage business and Gwynn's compensation are dependent on the fees and commissions Morgan Keegan earns when large hedge funds direct their substantial trading volumes and other business to Morgan Keegan. Gwynn and the Morgan Keegan head of equity capital, Collie Krausnick ("Krausnick") frequently travel to New York and Connecticut to solicit business from major hedge funds including defendants S.A.C., Exis and Third Point. Morgan Keegan, Krausnick, Gwynn and the defendant hedge funds agreed that the quid pro quo for such business was advance notice of, and influence over, the content and release of analyst reports on companies in which these large clients had positions.

69.     In the case of Fairfax, Gwynn collaborated with defendant hedge funds, in developing extreme criticisms of Fairfax to support both short-term and long-term shorting strategies dubbed "the Fairfax Project." Gwynn communicated these developed criticisms and his intention to release a highly negative report containing those criticisms in a series of road show presentations to major hedge funds including, among others S.A.C., Kynikos, Highfields, Greenlight Capital, and Perry Capital. The hedge funds participating in these discussions understood at their conclusion that Gwynn intended to initiate coverage of Fairfax with an extremely critical report, they understood and contributed to the substance of the criticisms to be included in the report, and they understood that the report's release would be timed to provide them an opportunity to establish their short positions. These critical Morgan Keegan clients also

understood that once they had established a short position in Fairfax, Gwynn would continue to support that position with negative reports until they covered. This understanding was critical because the Fairfax Project contemplated short-term and longer term components, the latter of which involved enormous potential exposure to the defendants if the stock price increased substantially.

70.     The defendants' stock manipulation scheme also includes other operatives who participated in the scheme, including but not limited to Christopher Brett Lawless ("Lawless"), John Hempton, and website Stocklemon.com, each of whom individually and collectively collaborated and continue to collaborate in the disinformation campaign against Fairfax; hedge funds Perry Capital, Viking Global Investors, Platinum Asset Management, Greenlight Capital, Lighthouse Capital, Ziff Brothers, and Pequot Capital; and the trading and brokerage departments of major Wall Street and less prominent firms that facilitated the defendants' manipulation of Fairfax stock by (a) rebroadcasting disinformation the defendants fed to them; (b) engaging in manipulative trading practices to support the short-selling attack; and (c) permitting defendants to heavily short Fairfax stock in violation of short selling rules.

### B.     Fairfax's Business

71.     Fairfax is an insurance and financial services holding company that owns, either wholly or substantially, several operating insurance companies. Fairfax stock is publicly traded on the Toronto Stock Exchange and, since December 18, 2002, on the New York Stock Exchange under the symbol "FFH." As of December 31, 2005, there were 17,056,856 subordinate voting shares and 1,548,000 multiple voting shares of Fairfax common stock outstanding. Fairfax stock is thinly traded, with an average daily volume on the New York Stock Exchange of only approximately 165,000 shares traded, with a significant portion of that volume

22

attributable to short sales. Fairfax stock is held by investors throughout the United States and Canada.

72.    Together with its operating divisions, Fairfax employs almost 8,000 people worldwide, owns over $27.5 billion in assets and has earned $5.9 billion in revenue in the fiscal year ended December 31, 2005. Fairfax was founded, and continues to be led, by V. Prem Watsa, who is the President, CEO and Chairman of the Board of Directors.

73.    Through its subsidiaries, Fairfax operates in North America, Europe, and Asia. Two of Fairfax's subsidiaries -- Seneca Insurance Company, Inc., and Hudson Specialty Insurance Company -- are domiciled and conduct business in the State of New York.

74.    A number of independent agencies rate the financial strength of insurance companies. Each has its own rating scale, its own rating standards, its own population of rated companies, and its own distribution of companies across its scale. Fairfax and its operating companies are rated by several rating agencies, including A.M. Best, Standard & Poor's, Moody's and Dominion Bond Rating Service.

75.    The views of the ratings agencies are critical to the success and viability of Fairfax and its operating companies. Due to the nature of the insurance business, an insurer's most important asset is the confidence its customers have in the ability of the insurer to pay potential claims, now and many years in the future. A diminished rating from a rating agency will often cause customers to divert underwriting business to competitors and to avoid relationships with an insurer that possesses a subpar rating. A severe ratings downgrade has the potential to have an immediate and catastrophic effect on an insurer's business, effectively making it impossible for that insurer to write new business and driving it into "runoff."

## C.    Defendants' Short-Selling Manipulation Scheme on Fairfax

76.     In 2002, Fairfax announced its intent to apply for listing on the New York Stock Exchange. At the time, the defendants collaborated with Gwynn in developing an aggressive short-selling campaign to be driven by false and misleading information and equity research reports. This campaign was dubbed the "Fairfax Project." The Fairfax Project contemplated a short-term component based on a highly negative Morgan Keegan report that would created an immediate and dramatic drop in the price of Fairfax stock from which defendants would reap enormous profits at the expense of Fairfax shareholders, including plaintiff and the Class; and a longer-term strategy to cripple Fairfax's business and depressing the value of its stock through a much more ambitious campaign of disinformation and manipulation.

77.     On December 16, 2002, Fairfax confirmed in a press release that its application for NYSE listing had been approved and the company would be listed on December 18, 2002. Immediately upon listing, defendant hedge funds began shorting the stock aggressively. In order to facilitate the rapid accumulation of their short positions, defendants listed (without any notice to or desire on the part of Fairfax) Fairfax shares on the Berlin Exchange, which they used to circumvent United States restrictions on short-selling. In addition, market makers working with defendants permitted them to engage in substantial short-selling even though no shares could be located to borrow or reasonably be expected to be located, and even though defendants' naked short selling did not constitute bona fide market making activities and, therefore, violated market regulations and are manipulative. In the first four weeks of Fairfax's trading on the NYSE, short-selling accounted for as much as almost 60% of the trading volume and the stock price declined by $14 per share, or 15%. By January 14, 2003, there were an astounding two million Fairfax shares sold short.

24

78. After the defendants had accumulated their desired short positions, stories fed by them began appearing in the media echoing the materially misleading and unfounded criticisms defendants had developed with Gwynn. Immediately thereafter, on January 16, 2003, Gwynn initiated coverage on Fairfax with an "underperform" rating in a report that contained the most incredible materially misleading and unfounded criticisms, and ignored, dismissed, or diminished all positive and mitigating facts.

### D. Defendant Gwynn's False Reports

#### 1. Gwynn's January 16, 2003 Report

79. Gwynn's January 16, 2003 report contained, among others, the following materially false and misleading representations:

- Fairfax was $5 billion under-reserved, when in fact no reasonable application of a credible reserve-setting methods supports such alleged deficiency. Gwynn's calculation was based on a methodology that he understood was invalid and in violation of the most fundamental reserve setting practices.

- Fairfax's shareholder equity was negative $4.4 billion, which was a number no credible methodology based on reasonable assumptions would support, and which Gwynn based on what he knew were unreasonable assumptions and invalid pseudo-methodologies.

- Fairfax's reported goodwill of $180 million as of September, 30, 2002 was actually $0 and would not survive the FY 2002 year end audit. No credible methodology based on reasonable assumptions would support these assertions, and Gwynn instead used what he knew were unreasonable assumptions and invalid pseudo-methodologies.

- Fairfax had no likelihood of securing realized gains for the 2003-2004 period, which was an assertion for which there was no reasonable basis and for which Gwynn understood there was no reasonable basis.

- Fairfax's reported deferred tax asset of $1.079 billion was unrecoverable and thus worthless, which was an assertion for which there was no reasonable basis and which Gwynn understood lacked a reasonable basis.

- Fairfax failed to provide Mr. Gwynn access to management when in fact Mr. Gwynn wrote his report without making any genuine effort or request for access to management or attempts to verify his grossly unreasonable assumptions.

The false and misleading picture of Fairfax that these and representations created was substantially aggravated by Gwynn's complete omission of positive and mitigating facts.

80.     Gwynn's report accomplished the defendants' intended objective. Promoted heavily by the defendants and their agents and operatives, the report's drastic assertions and their dire implications garnered extraordinary attention and equally great concern. Fairfax's stock plummeted 32% to an 8-year low on record volume 14-times higher than normal. By January 30, 2003, Fairfax stock had plummeted further to approximately $58 on substantially above-average trading in the two weeks after the Gwynn report. Industry and financial press sources uniformly cited Gwynn's report, and particularly his astounding assertion that Fairfax was $5 billion under-reserved, as the sole precipitating cause for this steep decline on enormous volume.

81.     With the stock price drop, defendants began covering large portions of their short positions for enormous short-term profits. With the short-term component of the Fairfax Project substantially complete, and unable to defend his absurd reserve estimates, on January 30, 2003, Gwynn released a report admitting that his estimated reserve deficiencies were wildly inflated by over $2 billion (or 40%) and his shareholder equity estimates were wildly understated by over $2 billion. As an excuse, Gwynn claimed he erroneously double-counted TIG subsidiaries. This excuse -- offered by a purportedly seasoned, careful, and unbiased professional analyst initiating coverage with estimates he knew were beyond the pale of reasonableness -- is simply not credible.

82.     Although defendants had covered substantial portions of their shorted shares, they had also retained substantial short positions and added to them as the stock rebounded,

26

understanding that Gwynn's January attack was just the beginning of an open-ended manipulation campaign directed at the far more ambitious and lucrative objective of causing Fairfax to fail.

### 2. Gwynn's February 11, 2003 Report

83. Accordingly, on February 11, 2003, Gwynn issued another highly critical report despite Fairfax's record fiscal year. Among other materially false, misleading and unfounded representations contained in the report, Gwynn claimed that Fairfax (a) had been unable to refinance debt obligations when in fact it had merely elected to redeem those obligations because doing so was economically better; (b) failed to strengthen asbestos and environmental reserves in 2002 as did the industry when in fact is had strengthened them by $133 million; (c) failed to secure the reinsurance needed for the release of $300 million in TIG assets held in trust, implying that this was not achievable when in fact it was and would be achieved by quarter end; and (d) had suffered a $17.69 million annual loss instead of a record gain based on readjustments Gwynn applied to Fairfax's reported financials for the sole purpose of diminishing its strong performance.

84. Defendants used Gwynn's unreasonably negative and materially misleading analysis to pressure shareholders into selling their shares at artificially depressed prices, and analysts and rating agencies into downgrading their ratings. In February, despite Fairfax's record year, Standard & Poor's reduced Fairfax's credit rating to BB from BB+ and the credit rating of its subsidiary TIG Insurance Company from BB to BB-. Fairfax stock experienced another substantial decline in heavy trading action over the course of the next two weeks to arrive at a new low by February 27, 2003, losing another 16.7% in value.

### 3.    <u>Gwynn's March 10, 2003 Report</u>

85.    Fairfax's stock price recovered leading up to the release of its annual report on March 10, 2003. As always, the 130-page single-spaced report provided enormous detail on the company's material business issues and confirmed the company's record fiscal year in 2002 and its sufficient cash and available credit to meet obligations, even without the receipt of the dividends Gwynn had previously incorrectly speculated would not be available to Fairfax.

86.    Nevertheless, Gwynn immediately issued a report containing additional materially false, misleading, and recklessly unfounded statements designed to stoke the uncertainty over Fairfax's liquidity that the defendants had already manufactured. In addition to repeating and affirming his prior misleading and unfounded assertions, Gwynn's March 10, 2003 report made, among others, the following false, misleading and unfounded assertions designed to maintain and aggravate the unfounded liquidity concerns he and the defendants had manufactured:

- Fairfax had significantly under-reserved for asbestos and environmental liability when in fact no estimate using reasonable assumptions and a credible methodology would have supported his assertions, which Gwynn understood and ignored. In addition, the potential A&E exposure to which Gwynn referred was also covered by reinsurance, thereby further demonstrating the speciousness of Gwynn concerns.

- Fairfax's ability to collect its reinsurance cover from Swiss Re was actually not backed by Swiss Re but by a "non-recourse" subsidiary of Swiss Re, thereby implying the reinsurance was not backed by a credit-worthy underwriter when in fact this reinsurance was backed by European Reinsurance Co. of Zurich, a special-purposes vehicle of Swiss Re that had an A+ credit rating and Fairfax had funds held collateral.

- Fairfax was not sufficiently liquid to survive 2003 when in fact by any reasonable analysis it had sufficient existing liquidity and ready access to more than enough liquidity to meet all its existing and reasonably contemplated obligations in 2003.

### 4. Gwynn's April 3, 2003 Report

87.     As Fairfax's stock price began to recover from the negative impact of his March 10, 2003 report, Gwynn continued his dogged defense of the defendants' scheme by issuing another report on April 3, 2003 repeating and reaffirming his previously false, misleading, and unfounded assertions and adding the following:

- Fairfax should write-off as worthless Cdn$293 million in subsidiary Lindsey Morden goodwill even though he lacked any reasonable facts or rationale for this assertion.
- Fairfax subsidiary ORC was late in filing its 2002 financial statements even though this was not true and, even if it were, it would be immaterial to the investment value of Fairfax.

### 5. Gwynn's Unfounded Allegations Exposed

88.     Gwynn's unfounded alarms concerning Fairfax's liquidity were exposed on April 11, 2003, when Fairfax announced it would conduct an initial public offering of its subsidiary Northbridge Financial Corporation, which was successfully priced on May 21, 2003, and thereafter completed.

89.     Similarly, on May 2, 2003 Fairfax announced first quarter results that included a net increase in earnings to $154.6 million, an 18.6% increase in net premiums written ($1.6 billion), a combined ratio of 98.1%, and realized gains on investments totaling $228.2 million for the first quarter of 2003. By May 21, 2003, Fairfax stock had rebounded from a low earlier in the year of $47 to $87.

90.     Thereafter, Gwynn's unfounded liquidity concerns and other scaremongering were further discredited on May 30, 2003 when Fairfax announced a $300 million debt offering by its subsidiary Crum & Forster Holdings Corp. That offering closed on June 5, 2003, by which time the stock had rebounded to $152 and would continue to climb to $174 by July 14, 2003.

### 6.   Gwynn's Defense of Defendants' Short Position

91.   Over the remainder of 2003 and 2004, Fairfax repeatedly and in increasingly strong terms demonstrated that the defendants grossly exaggerated warnings and disinformation about Fairfax's purportedly dire financial condition were unfounded.  As a result, during this period Fairfax stock remained consistently above $100 and climbed steadily to almost $170 by the end of 2004.  Throughout this period, however, short interest remained above 1.5 million shares and climbed steadily in the latter half of 2004 to almost 2.7 million shares.

92.   The enormous and sustained short interest that existed in Fairfax stock since it listed on the NYSE has been comprised of defendant hedge funds who retained, traded in and out of, and, in some instances, increased their short positions in the long-term objective of depressing the value of Fairfax's stock.  In addition, defendants were encouraged to remain in the scheme because the high price of Fairfax stock, the enormously large short position, and the unavailability of shares to purchase made it very difficult for them to cover without incurring enormous losses.

93.   For his part, having committed to support the short-selling interest of his major hedge fund clients, and with those major clients carrying enormous exposure in an extremely difficult short position to exit, Gwynn was left with no choice but to continue to act as a negative siren on Fairfax no matter how badly events discredited his prior predictions or current events and facts contradicted his relentless drumbeat of false, misleading, and recklessly unfounded reports.

94.   For example, as Fairfax stock was rebounding from $50 to $96 in the spring of 2003, Gwynn issued a report on May 6, 2003 that repeated and reaffirmed his previous

30

misleading and unfounded analysis concerning Fairfax and added the following equally misleading, unfounded, and distorted assertions:

- Fairfax's Northbridge IPO filings failed to disclose its reserving details or asbestos reserves, when in fact Fairfax had always reported the Canadian reserve development tables in the annual report, the reserve development over the last decade had been favorable, and there was no disclosure of asbestos reserves by subsidiaries because they did not have any significant asbestos reserves.

- Fairfax's business strategy of acquiring troubled property and casualty companies was flawed and its prospects weak because of this flawed model when in fact Fairfax had not made a significant acquisition in more than four years and had built an excellent platform for growth by any reasonable measure as evidenced by the first quarter results.

- Gwynn raised unfounded concerns about the ability of Fairfax's Northbridge subsidiary to sustain the level of dividend and interest income achieved in the first quarter without any reasonable basis or honest belief.

- Gwynn intentionally ignored the various elements of the first quarter results that plainly contradicted and warranted revision to his prior extreme predictions of doom.

Gwynn would issue increasingly negative and misleading reports throughout this period of improving financial performance and stock price with a frenzied publication rate far in excess of any other company he covered, including reports issued on May 21, 2003, August, 20, 2003, October 10, 2003, November 26, 2003, February 8, 2004, February 26, 2004, March 12, 2004, August 9, 2004, August 11, 2004, August 20, 2004, August 27, 2004, September 8, 2004, October 5, 2004, October 29, 2004, November 1, 2004, November 3, 2004, and November 24, 2004.

95. Although Gwynn's relentlessly negative series of reports on Fairfax did not provide the defendants with the opportunity to cover at anything other than a substantial loss during 2004, it did nevertheless manage to artificially and dramatically depress the price of the

Fairfax stock, which throughout this period traded at a substantial discount to Fairfax's book value compared to its peers.

### E. Defendants' Early 2005 Efforts to Limit their Risk

96. By the beginning of January 2005, short interest in Fairfax had increased to almost 3 million shares. Moreover, Fairfax stock was listed on the SEC's Regulation SHO list of threshold securities with substantial and persistent failures to deliver shares to the buyers from the list's inception in January 2005 and every day thereafter until a brief hiatus in July 2005.

97. In February 2005, however, Fairfax announced results for the 2004 fiscal year that further confirmed its financial stabilization and turnaround and continued to erode enormously the doomsday scenario upon which the long-term "Fairfax Project" was based. Following quarters that year likewise showed financial strength. The mounting evidence of Fairfax's stabilization and turnaround placed short-selling defendants under immense pressure: Fairfax's strengthening position made it increasingly less likely that it would experience a fatal or near fatal collapse; the defendants' fear-mongering would become less and less effective; the stock price would go up, and the already extreme difficulty in attempting to cover the huge outstanding short position would become near impossible.

98. However, given the price levels and lack of share supply, defendants had no viable and attractive exit strategies. Accordingly, the defendants redoubled their efforts to depress the value of the Fairfax stock in order to generate a sufficiently low stock price and high supply of shares to profitably cover their short position.

99. As always, Gwynn continued his relentless litany of negative reports in support of his clients' enormous short positions, rebroadcasting the defendants' standard and newly-invented falsities about Fairfax, and consistently attempting to neutralize the increasing positive

news out of Fairfax. Thus, for example, in response to the 2004 year end results released in February 2005, Gwynn issued a highly negative report stating among other materially inaccurate and unfounded assertions that Fairfax's hurricane losses grew approximately $67 million in the fourth quarter on an after tax basis when in fact losses had increased only approximately $21 million after tax. Going forward, Gwynn would issue three times more reports on Fairfax from 2005 to 2006 -- all overwhelming negative -- than his average and more than double his next most frequently covered company.

100.    In addition, the defendants also used Fitch rating agency's analyst Lawless to broadcast their falsehoods, which he did in a highly critical March 2, 2005 report that was materially false, misleading, and unfounded in numerous respects including, among others, the following:

- The report asserted that underwriting at the core operating facilities was weak, when by any reasonable measure the underwriting was strong as evidenced by combined ratios for these core operations of 97.6%, 97.5%, and 107.6% in 2003, 2004, and 2005 respectively compared to combined ratios in the same years of 100.6%, 106.7%, 138.5% in the overall reinsurance industry and of 101.9%, 100.2%, and 102.5% in the overall commercial lines industry.

- The report asserted that Fairfax's various successful efforts to provide liquidity in the prior fiscal year by raising money would leave it without that ability in the current fiscal year when in fact by any reasonable measure Fairfax retained sufficient financial liquidity and flexibility.

- The report criticized the sufficiency of Fairfax's disclosures concerning related party transactions, when Fairfax's public disclosures included separate financial statements and 10-K's for not only the Fairfax holding company but also its Northbridge, C&F, and Odyssey Re subsidiaries each of which included unusually lengthy and detailed disclosures of all material transactions including related party transactions.

- The report asserted that Fairfax's investment gains for the prior fiscal year were inconsistent sources of income, when in fact

Fairfax had realized investment gains of $275 in 2004 and had a twenty year average total return of 9.3%.

- The report accused Fairfax of establishing ORC Re Limited in 1998 for the express purpose of facilitating finite reinsurance covers, when in fact, as previously and fully disclosed, it was established to serve as the entity through which Fairfax would provide financing for its US acquisitions, would consolidate its European run off portfolios, and would provide protection for the US subsidiaries upon acquisition (ORC Re did subsequently provide finite reinsurance covers for the benefit of Fairfax group operating companies).

- The report accused Fairfax of using inter-company reinsurance transactions with nSpire Re to inflate dividends to Fairfax by over $500 million, when in fact the reinsurance transactions accounted for none of the dividend to Fairfax. Indeed, those reinsurance transactions resulted in losses to nSpire Re and provided no dividend capacity. Instead, the $500 million dividend was generated by interest nSpire earned on its financing of US acquisitions.

- The report criticized Fairfax for focusing on acquisitions and investments instead of operating the underlying underwriting businesses, when in fact Fairfax's approach to decentralized management of the various operating entities and centralizing investing and strategic planning had resulted in operating company premiums more than doubling in the hard market years of 2002-2004 inclusive while Fairfax produced enormous investment gains.

- The report asserted that Fairfax was more vulnerable to commercial lines price softening and a shifting to higher rated insurers, when in fact Fairfax's core insurance underwriting performance was outstanding and sustained by any reasonable measure, including in areas impacted by hurricanes.

- The report asserted that Fairfax's cost of float was in excess of 15% which reflected cumulative underwriting losses of $4.5 billion, when in fact this calculation improperly included in the cost of float calculation expenses incurred by subsidiary Lindsey Morden that had nothing to do with float cost. Moreover, even if those expenses were properly included in a float costs calculation then the report improperly and inexplicably excluded the associated fees earned.

- The report asserted that the company's aggressive debt restructuring and $300 million equity placement reflected a lack of confidence in the operating companies, when in fact Fairfax had always maintained significant cash at the holding

company and disclosed for decades this paramount policy. Moreover, as was disclosed, Fairfax raised the $300 million for potential use in its European run-off and not in any way because of its operating companies.

- The report asserted that Fairfax had not disclosed material information related to its Swiss Re contract and certain ceded losses in its annual report or in that of its subsidiaries, when in fact the annual report disclosed in detail precisely that information and none of subsidiaries were involved in those aspects of the Swiss Re contract.

- The report asserted that Fairfax inadequately disclosed credit facilities in FFH Gibraltar and FFHL (Luxembourg) when in fact there were no such facilities.

101.    The Fitch analysis Lawless produced was not only materially false, misleading, and recklessly unfounded in its affirmative criticisms, it inexplicably omitted from its analysis numerous highly material positive facts that could only have been ignored if the objective was to present a highly skewed negative analysis. For example, Lawless ignored Fairfax's (a) improved cash flow and liquidity after reducing its debt maturities over the following five years, (b) reduced funding of future premiums on existing finite reinsurance contracts, (c) reduced risk of further reserve development, and (d) demonstrated ability to access subsidiary cash in arms-length transactions.

102.    Indeed, later Fitch reports prepared after Lawless departed noted the materiality of these positive facts. Relying on these facts, those reports describe Fairfax's demonstrated financial flexibility as a key company strength, and expressed confidence that Fairfax retained such flexibility going forward. Similarly, those reports acknowledged that Fairfax was generating strong operating earnings with combined ratios below 100%. In addition, the reports praised Fairfax's 2004 debt restructuring as a substantial improvement. Finally, the reports acknowledged that Fairfax had turned the corner with a management commitment to underwriting discipline.

103.    In addition to this formal report, Lawless would, going forward, actively participate in the efforts to talk down Fairfax to securities analysts, journalists, and other important constituencies.

**F.    The Defendants Work to Limit Their Risk**

104.    As a result of the further evidence of Fairfax's stabilization and turnaround, and the difficulty the defendants were having in the face of that strengthening, they began taking steps to minimize their increasing exposure. Defendants with the largest exposure began covering portions of their positions to the extent they could, entering into hedging transactions, and shifting portions of their positions to other, less exposed defendants. The impact of these efforts appeared plainly in the trading behavior. On April 29, 2005, when the stock closed at $130, there were approximately 2.75 million shares sold short, and Fairfax had been on the Regulation SHO list of threshold securities every day since its inception. On July 12, 2005, when the stock closed at $172, shares sold short declined to approximately 2.2 million shares, and Fairfax was removed from the Regulation SHO list for the first time. By August 4, 2005, the stock price further increased to $179 while the shares sold short interest declined to just above 2 million shares.

105.    During this covering period, Gwynn frantically issued four highly critical reports for the purpose of suppressing the substantial price increase resulting from Fairfax's improving condition and the short-selling "squeeze." For example, on May 2, 2005, Gwynn issued a report claiming, among other false and misleading things, that Fairfax had enormous reserve deficiencies, unfunded APH, excessive reinsurance recoverable leverage, and excessive finite reinsurance. In addition, Gwynn claimed that Fairfax's combined ratio for the quarter was almost 115%, which was a figure that was demonstrably untrue under any accepted and faithfully applied combined ratio calculation methodology. Indeed, to arrive at this figure

36

Gwynn, among other things, included in his calculation certain subsidiary expenses that were not relevant to the combined ratio and even then excluded fees earned associated with those expenses.

106. In addition, to further the defendants' objective of manufacturing fear about, and actually instigating regulatory and other legal action against, Fairfax, Gwynn commented on Fairfax's recent receipt of an SEC subpoena concerning finite reinsurance with the wild speculation, "I would expect more subpoenas to come," and rationalized this unfounded statement based on the further recklessly false and misleading assertion that Fairfax was involved in "the egregious use of finite reinsurance."

107. In a July 13, 2005 report, Gwynn added to his previous recklessly false and unfounded assertions the equally false and unfounded assertion that subsidiary OdysseyRe was grossly under-reserved for the periods 1997-2001 based on a generalized industry comparison that did not take into account far more predictive data. Gwynn adopted the least rigorous and informative methodology because he understood it provided the most negative -- and most distorted -- picture of Fairfax. Further evidencing defendants' agenda, Gwynn omitted to mention that during the same period, OdysseyRe was one of the few insurers not to increase its exposure, which would have constituted a substantial mitigating factor to the results of his bogus analysis. On August 6, 2005, Gwynn warned "If you are a shareholder of Fairfax, your first question would probably be: Have the true economics of the business been clouded by accounting gimmicks, including finite? There's no doubt in my mind, that Fairfax has done exactly that."

### G. The Defendants' Renewed Fall 2005 Attack

#### 1. The SEC Subpoena

108.    On the morning of September 6, 2005, defendant Bernstein called one of Fairfax's officers seeking comment on the SEC's subpoena to Fairfax concerning finite reinsurance. At the time, Fairfax had received no such subpoena, and Bernstein was so informed. The next day, however, Bernstein's question proved remarkably prescient when Fairfax received an SEC subpoena. Moreover, the short position in Fairfax increased substantially in the lead up to the announced SEC subpoena. On September 15, 2005 Fairfax returned to the NYSE threshold securities list, where it has remained every day since.

#### 2. The Bogus October Reports

109.    On October 7, 2005, defendant Contogouris, disguised as MI4 Reconnaissance, issued an "FFH Morning Note" to Fairfax shareholders, analysts, rating agencies, and others. The report failed to disclose that it had been prepared and was being disseminated by Contogouris on behalf of a group of short-selling hedge funds for compensation in direct violation of Section 17(b) of the Securities Act of 1933. The report repeated various materially false, misleading, and recklessly unfounded assertions the defendants were disseminating about Fairfax including the following:

- "the company's financial position was weak";
- its reported financial numbers were false and inconsistent with its "real" financials;
- Fairfax's announced $300 million offering demonstrates it has "'a brazen commitment to self-dealing'";
- "MATERIAL INFORMATION ABOUT THE GROUP'S FINANCES WAS WITHHELD FROM THE 'STREET' AHEAD Of THIS OFFERING";
- Watsa is the only Fairfax board member;
- Fairfax's $300 million offering was like the drawing down on revolvers that occurred as part of the Enron fraud;

38

- Fairfax raised capital because all its other assets were already pledged or double pledged for loans that were borrowed and moved through off-shore, off-balance sheet vehicles;

- Fairfax conducted a private $300 million offering in order to conceal material nonpublic information about the true nature of its pledged assets and "selected" the recipients of the offering based on their likelihood to accept Fairfax's material non-disclosures or because they were selectively informed and thereby were "trading on inside information" because they had "some quid pro quo in hand";

- Major shareholder Southeastern Asset's chief was not a smart investor but "too stubborn to consider objective analysis" as evidence by the fact he "rode Fleming Waste Management in the ground", and "FFH will be yet another example of this."

### 3. The Stocklemon.com Report

110. The defendants followed up these developments with a report by the internet website Stocklemon.com, which is a regular mouthpiece for short sellers. On October 21, 2005, Stocklemon.com issued a report entitled "Where There's Smoke There's Fire . . . Could Fairfax Financial Be the Next Refco?????". Echoing exactly the defendants' standard script, the report stated "Stocklemon believes that the current circumstances regarding investigations and claims might be the final blows to Fairfax Financial," referenced the October 10, 2005 Wall Street Journal article in asserting that "[i]nstead of acting professionally and describing the details of the investigation, Fairfax was quick to put out a PR stating only that they did not receive a subpoena from the U.S. Attorney," and claimed that the "lunacy of these statements was best expressed on this White Collar Crime Blog."

111. In fact, however, the cited blog said nothing remotely similar to Stocklemon.com's characterization. Instead, it noted that the Wall Street Journal story alone dropped Fairfax stock over 8% and questioned "How is it that companies find out from the media when they are being investigated as opposed to from the government? And will the media prove correct here?" Likewise, the specific blog section hyper-linked in the Stocklemon.com questioned:

39

> Are they a *target* of an investigation? Are they a *subject* of an investigation? Or are they just a *witness*? What exactly was Fairfax told? And if they are being investigated, should the government be issuing a target letter? Is Fairfax trying to hide information from its investors, or is this a situation that the government is not being up front with the company? Or is this a situation that the government is trying to pressure the company to provide information and individuals for their investigation? *The government has the ability to place enormous pressures on companies during an investigation. On the other side, the release of information of a pending investigation can be detrimental to a company. Is there a better way of doing things here?*

(emphasis added).

112.    Stocklemon.com also rebroadcast the defendants' various unfounded assertions that Fairfax was dangerously illiquid and concealing this fact through fraudulent stock offerings and offshore dealings.    In this regard, Stocklemon.com tellingly linked a document the defendants had previously prepared concerning purported "similarities" between Fairfax and the fraudulent failed Australian insurance company HIH.

113.    Stocklemon.com likewise rebroadcast the defendants' standard attack on Watsa personally.  The report asserted falsely that while Warren Buffet "has a successful track record based on high profile investments that have paid out in the long term, Mr. Watsa has kept most of his investments hidden from his shareholders."  It cited two press articles as support for this proposition, although neither article actually provided such support.    It then compared Mr. Watsa's practices to those "of Enron and Refco."  As examples of such Enron-like behavior, the Stocklemon.com report regurgitates the defendants' recklessly false and unfounded accusation that Fairfax's Luxembourg subsidiary was being used as a vehicle for fraud.

114.    Stocklemon.com also rebroadcast the defendants' false and unfounded assertions "that Price Waterhouse has not exercised any professional skepticism in the auditing of Fairfax Financial and therefore is negligent in fulfilling SAS no. 99 requiring professional skepticism."

The report concludes with a summary of the defendants' fear-mongering mantra -- "Where there is smoke, there is fire" -- and further comparisons to Enron and Refco's conduct.

### 4. Harassment and Pressure on Fairfax Executives and Professionals

115. At the same time defendants began an aggressive campaign harassing Fairfax executives and personnel intended to erode their confidence in Fairfax, intimidate them into providing material non-public information for the defendants' trading purposes, and instigate internal e-mail, phone, other insider communications that the defendants hoped to gain access to in various ways. By way of example only, the defendants engaged in the following assaults on Fairfax insiders:

(i) On November 9, 2005 a package was delivered by courier to Mr. Watsa's pastor at St. Paul's Anglican Church in Toronto. The package purported to be from a "P.Fate" with the return address and phone number of Saint Patrick's Roman Catholic Cathedral in New York City. The package contained a letter addressed to Reverend Parker stating:

> Dear Father, The attached documents are being sent to you out of my concern for the Church's finances. I am extremely sensitive to this as a result of losing a dear friend Father Richard Bourgeois, an enlightened Benedictine Priest formally of the Collegio D'Anselmo, which as you may know is the Cardinal College of the Vatican. On September 4, 1999 the fugitive Marty Frankel, who perpetrated a massive fraud on the Catholic Church, was arrested at the Hotel Prem in Germany. Interestingly a review of your most recent "Talk in the Pews" shows Mr. Watsa as the Chairman of the investment committee of the church. More interestingly are the similarities in the facial features between Mr. Marty Frankel and Mr. Prem Watsa. While these coincidences are surprising, they do not compare to the similarities between the massive money-laundering schemes perpetuated by Marty Frankel and the massively convoluted paper shuffle created by Mr. Watsa through his public vehicle Fairfax Financial Holdings Ltd. . . . the pattern of activities of Mr. Prem are too similar to the course of conduct of Marty Frankel to be overlooked by a person such as yourself, who is responsible ultimately for the funds of the congregation. Be aware Father, be skeptical and ask Mr. Watsa to make confession. God Bless, P. Fate.

Attached to the letter was a 30-page document entitled "Marty Frankel: Sex, Greed, and $200 million fraud" which detailed Mr. Frankel's enormous insurance fraud and money laundering schemes, his fraud on and exploitation of the Catholic Church, the indictment of an elderly Catholic priest, and sordid details of Frankel's sadomasochistic and group sex and other sensational activities.

(ii)     The same day these same documents delivered to Reverend Parker were e-mailed to Mr. Watsa at his office. These materials left with Rev. Parker and e-mailed to Mr. Watsa were prepared by Bernstein at Exis's New York office, and sent from those offices in order to undermine Mr. Watsa's reputation for integrity and honesty, generating suspicions about his activities, facilitating the defendants' efforts to intimidate insiders -- including Watsa's assistant and others who may see this e-mail -- into providing the defendants with material non-public information to use in their trading, distracting Watsa and other high level personnel whose focus was critical to Fairfax's success, and instigating negative press stories comparing Watsa to Frankel in the event he vacated his post as financial advisor for his church.

(iii)     For the same purposes, on November 10, 2005, Contogouris using an alias "Monty Gardener" e-mailed Watsa stating "EX_REFCO CEO BENNETT CHARGED WITH SECURITIES FRAUD , OTHER CHARGES IN 8-COUNT INDICTMENT."

(iv)     On November 15, 2005, Bernstein called Watsa's executive assistant asking that she call him to discuss Prem and Fairfax. When she did not return that call, Contogouris sent another e-mail from his alias "Monty Gardener" again stating "EX_REFCO CEO BENNETT CHARGED WITH SECURITIES FRAUD, OTHERS CHARGED IN 8-COUNT INDICTMENT."

(v)      On December 12, 2005 two operatives of the defendants appeared at Watsa's home and attempted to question his family about the whereabouts of Watsa and his wife in a threatening manner.

(vi)      On December 14, 2005, an agent of the defendants entered Fairfax's offices, dropped off a package for Watsa, and began conspicuously photographing the reception area extensively.  The package contained 2 copies of the 2004 nSpire Re Financial Statements and FFHL (Luxembourg) S.a.r.l. audited financial statements for the period December 31, 2003 and the financial statements of the company as of March 12, 2003.  The Luxembourg documents contained a government stamp certifying they were true copies of the originals.  This stamp was dated November 14, 2004 and although the document post-dated the Stocklemon.com's October 21, 2005 report this exact document was added to that website at or about the time it was left for Watsa.

(vii)      On December 14, 2005, the wife of a former Fairfax CFO observed an unidentified man approaching her house from a taxi, but by the time she arrived at the door he had disappeared into the taxi leaving the same documents that had been left for Watsa that day on the doorstep with no envelope.

(viii)      On December 16, 2005, Bernstein sent an e-mail from a Hotmail account to Fairfax's analysts, rating agencies, shareholders, and select sympathetic journalists.  The e-mail attached a document entitled "Trevor's Travels:  The Kingsmead Fraud -- Another Enron-Like, off-balance sheet deception."  The document described in a materially false, misleading and recklessly uninformed manner transactions -- described as the "Kingsmead" transactions -- involving assets Fairfax acquired in its 1999 acquisition of TIG.  In addition to materially

mischaracterizing the nature of these assets and transactions, the document made, among others, the following false and defamatory statements:

- The Kingsmead transactions were a "Fraud," an "Enron style described fraud," "another Enron-like, off-balance sheet deception," "an international fraud perpetrated on U.S. shareholders, which is similar to Enron's supporting of balance sheet vehicles managed by Andy Fastow and his wife."
- This "fraud" was necessary "for Prem's Fairfax holding company, as it is chronically illiquid and basically insolvent" and Watsa engaged in "deceptions" that were "violations of securities laws" and "criminal" conduct so he could use the Odyssey Re subsidiary as his "piggy bank."
- Fairfax failed to disclose liability associated with the Kingsmead assets when in fact Fairfax made numerous disclosures of this liability in its 2001 Annual Report.

Bernstein prepared and sent this document as part of his financial relationship with the defendant hedge funds and did not disclose this relationship in the documents in violation of, among other things, 17(b) of the Securities Act of 1933 and Rule 10b-5.

(ix) On December 16, 2005, Watsa received an e-mail from a "Robert Rafelson" stating "Hey, Prem are you using the shareholder's money to fuel the corporate jet for your family's personal use? I hope not. Love, Rob." This e-mail was sent by Bernstein from Exis's New York office.

(x) On December 18, 2005, defendants' operatives were parked outside Mr. Watsa's house and followed him when he drove away.

(xi) On December 19, 2005, Watsa's executive assistant received two e-mails directly from "Dick Tracy" attaching a document that was addressed to her at "'Fairfax Financial' or Whatever It Is Today" and threatened her with the consequences of being involved in criminal behavior:

The attached documents are being sent to you out of concern for your unwitting participation in possibly very serious federal crimes committed by Mr. Prem Watsa.

On September 4, 1999, the fugitive Marty Frankel, who had perpetrated a massive fraud on many people close to him, including the Catholic Church, was arrested at the Hotel Prem in Germany. First look appears to have a clear connection to Mr. Watsa, if only by name. Interestingly, a closer look at a picture of Mr. Prem Watsa's facial features, photo comparison attached herein, shows some disturbingly haunting similarities between Prem and Marty. No doubt you are aware that Prem wears glasses of similar shape and size that rest askew on the bridge of his nose like Marty's. . . .[1]

While these coincidences are surprising, they do not compare to the similarities between the massive money-laundering schemes perpetrated by Marty and the massively convoluted paper shuffle created by Prem through his public vehicle Fairfax Financial Holdings Ltd. One has to ask how this unbelievably meteoric rise of this roll up of garbage insurance companies could happen without Prem's close team working together to create and maintain a course of conduct that is in fact, a premeditated and sustained deception of investors. Although one could say over the last year, many close associates of Mr. Watsa have been sufficiently worried about his behavior and seem to be dropping off the Fairfax map at a rate that only an insurmountable contradiction [sic] of the Ebola virus singling out Prem's people could explain otherwise.

Please understand that this behavior will not stand. This pattern of deception that Prem practices is too similar to that of Marty Frankel to be overlooked. A person such as you has a lot to lose. No doubt you are aware that those that don't help Prem end up leaving after years of service with the severance afforded those that work at Burger King drive thru. Be aware Ms. [name omitted] he will be held accountable. Prem is not above the law.

Halleluiah!

The letter attached the same thirty-page expose on Mr. Frankel entitled "Sex, Greed and $200 million Fraud."

(xii) On the same day, Watsa's assistant received another e-mail from "Dick Tracey" with a re line "PERSONAL USE OF THE FAIRFAX COMPANY CORPORATE JET BY PREM WATSA AND FAMILY" that stated:

---

[1] The letter includes a picture of a bedraggled fugitive Frankel and not remotely similar picture of Watsa.

The attached documents are being sent to you out of concern for your unwitting participation in possibly very serious federal crimes committed by Mr. Prem Watsa. Recent Press of Conrad Black (another Canadian of dubious reputation) suggests, based on allegations of the U.S. Government, that he did not respect third party shareholder's money for which he was not the custodian. I think that you should be particularly sensitive to issues that regard Mr. Watsa and his family's personal use of the Company's jet. Operating under the assumption that as Prem's personal secretary you make the arrangements to schedule the plane for use and in fact probably have the tail number memorized, you should note the U.S. Attorney's frowning upon Mr. Black using shareholder money to fuel the company jet for personal use is quite serious. You see Ms. [name omitted], you work for the shareholders of the Company that own the plane. All of them, and not for Mr. Watsa. And as of today it can't be confirmed for sure if Mr. Watsa is even one of them, or if he has pledged, lost or squandered any holdings he may have. Therefore, it is incumbent upon you to double check any direction Mr. Watsa or his family members give you with respect to the plane's use. U.S. Attorney Mr. Fitzpatrick may want to know. See the Conrad Black press of November 18th below.

In particular Ms. [name omitted], please keep you [sic] antenna up to spot any move Mr. Watsa in directing the jet to fly him and his family to India to escape prosecution. You would likely have knowledge of such an event and could be held responsible as a co-conspirator in arranging Mr. Watsa's fleeing of the country.

Fly Straight Ms. [name omitted]!

The e-mail attached documents regarding Marty Frankel's use of the corporate jet and was prepared and sent by Bernstein at Exis who attempted to cleanse the e-mail and attachment of all electronic identifying information because he understood his conduct to be improper.

(xiii)   When Watsa's assistant did not respond to the various e-mails she had received, on December 21, 2005 Bernstein resent the two "Dick Tracey" e-mails with the same message and attachments. On December 29 and 30, 2005, after receiving no response from Watsa's assistant, Bernstein re-sent the same two e-mails and attachments to her again.

(xiv)   On December 28, 2005, Bernstein sent a document to Fairfax's shareholders, analysts, rating agencies, and sympathetic members of the media that made materially false, misleading, and recklessly unfounded assertions concerning an inter-company

46

share transfer of OdysseyRe stock. The document cites and echoes the recent Reality Check article. Among other things, the document made the following materially false, misleading, and recklessly unfounded statements:

- Watsa was attempting to "prop" up OdysseyRe shares and "mov[ing]" them from subsidiary to subsidiary (or related company) to keep the waters muddy" and thereby conceal an underlying money drain;

- "all of ORH shares and everything FFH owns in the United States had been hocked"

- "Using the undisclosed vehicle, FFHL (Luxembourg) S.a.r.l., all the assets of the Fairfax (Gibraltar) Ltd., by extension Fairfax Inc., and by further extension Odyssey Re and subsidiaries are pledged"

- Bermuda and offshore reinsurance subsidiaries, CRC Bermuda and Wentworth, "were being used for purposes to "hide" transactions"

- CRC Bermuda and Wentworth were using $600M in losses ceded to them by Northbridge to fund European Runoff losses in a manner concealed from insurance regulators using the Luxembourg subsidiary in a "robbing from Peter to pay Paul" scheme concealed by Watsa.

- That this "scam" was being used to also "perpetuate the illusion of a 'transfer of risk' on third party reinsurance transactions like Swiss Re."

(xv) On December 30, 2005, Contogouris created three identical websites www.premwatsa.com, www.premwatsa.net, and www.Premwatsa.co.uk with a homepage consisting of the image of a shredded piece of paper containing an Enron logo altered from an "E" to an "F" with the word "Fairfax" substituted for "Enron." On the bottom of the shredded paper appeared the title of the best-selling book on the Enron scandal "The smartest guys in the room." In front of the shredded piece of paper was a distorted photo of Watsa and other Fairfax executives under which appeared the words "Come see where all your money went." On another page there was a picture of Watsa, the same altered symbol, and a map of Bermuda under which the words "coming soon . . ." were appended.

47

The websites were then used to disseminate misleading reports and disparaging accusations concerning Watsa, including his alleged involvement in criminal and unethical behavior.

(xvi) Between February 14-16, 2006, Fairfax's website experienced six separate cyber-attacks attempting to hack into the Fairfax server using the same internet service provider as various defendants. Moreover, throughout February, defendants including Bernstein and Contogouris aggressively pursued existing and former Fairfax executives in a desperate effort to develop some information upon which to support their recklessly inaccurate misinformation and theories.

(xvii) In early March, the defendants again began disseminating material misinformation and baseless accusations to Fairfax's auditors, and threatening those auditors with legal action. For example, on March 2, 2006, an e-mail from Bernstein's alias "Robert Rafael" was received by PwC auditors stating as follows:

> I understand you are looking at restatements of Fairfax Financial Holdings. Please be advised that it appears that the attached documents show that your firm knew of a MATERIAL inflation in the financial statements of FFHL (Luxembourg) S.a.r.l. one day before a crucial audit which was used to certify assets that were being pledged for a loan in 2004. To the extent that short sellers have suffered damages in the cost to borrow shares of Fairfax that have been supported by these materially false financial statements produced by your firm, you may be held liable. It is incumbent on you to reexamine the whole chain of transactions at every off-shore shell company subsidiary as it appears likely that Fairfax has inflated their assets. Please see the attached documents.

The e-mail from Bernstein attached the Luxembourg filings the defendants had been peddling to shareholders, analysts, rating agencies, and journalists and arranged to have posted on the Stocklemon.com website. Bernstein sent a second e-mail to Fairfax's auditors under the false identity "Robert Rafelson" on March 6, 2006.

48

(xviii) On March 9, 2006, the General Counsel of one of Fairfax's European subsidiaries informed Fairfax that she had received an eerie e-mail from a Spyromi4@aim.com stating "I am reading about you in the Lawer [sic] News and am stunned by the fact that you are posing next to the largest nose I have ever seen. Being so close to such a nose, one would think the sense of smell would rub off on you. In particular can you smell the very serious negative issues that are facing runoff for Fairfax. Issues which, you seem to have glossed over when meeting with Miss Helen Morris for your article. In fact runoff doesn't seem to be going well at all. Correct?" The e-mail concluded with the ominous "I will be seeing you soon [name omitted]."

(xiv) Between March 10-16, 2006, the CFOs of Fairfax and its largest subsidiaries received unidentified e-mails from Spyromi4@aim.com; Bernstein called Watsa's assistant to inform her that they knew Mr. Watsa's out of office whereabouts and itineraries; anonymous questions addressed to Watsa and Fairfax CFO Taylor were dropped off at their Odyssey Re subsidiary; and audio clips from Harry Potter and a George Bush speech were left on Watsa's home telephone message machine and the office voicemail of Fairfax's CFO.

## H.    Defendants' Further Attempts to "Bring Down Fairfax"

116.    Although the defendants' efforts were having a material adverse impact on the Fairfax stock, depressing its price from $153 on February 1, 2006 to $133 on April 3, 2006, the impact fell far short of the defendants' expectations and, more importantly, far short of what the short-selling defendants needed to cover their short sale without suffering severe losses, let alone reaping the type of profit for which they had been waiting a long time. The defendants understood they required far more convincing and damning material to hope to achieve their goal of "bringing down Fairfax" so they could avoid staggering losses and make this investment

49

profitable. Accordingly, the defendants agreed to an ever more bold and aggressive attack against Fairfax, which they planned to successfully complete by July.

117. The defendants' revised plan to "bring down Fairfax" was to coordinate (a) a drastic downward manipulation of the price of Fairfax stock through various bogus trading activities; (b) a blitz of wildly alarming false statements of Fairfax's imminent demise; (c) ominous questions to major shareholders from a business reporter working with the defendants; and (d) a series of negative articles echoing and endorsing the various theories the defendants had developed. The plummeting share price, disseminated false statements, unnerving journalist questions, and bad publicity were intended to panic major shareholders into selling their shares and thereby causing the stock to plummet on a volume sufficient for the short-selling defendants to cover as much of its short position as it desired before a final push to destroy the company.

118. Thereupon, defendants, including Exis, Sender, Heller, Contogouris and Bernstein, in coordination with Cohen, S.A.C. and others, ratcheted up their communications with shareholders and analysts, to whom they continued to assert that Fairfax was a fraud like Enron, Refco, and various other known corporate frauds. They also undertook to find another business publication that would be willing to run stories rebroadcasting the theories that had been developed but had failed to get any publications to credibly consider and write about.

### 1. Defendants' Renewed Effort to Develop Convincing Theories

119. Realizing that their dated and factually unfounded bag of defamatory accusations were now insufficient, defendants renewed their efforts to extract non-public insider information which they hoped to spin in ways damaging to Fairfax. For example, on May 31, 2006, Contogouris lied his way past security at Fairfax's RiverStone subsidiary in London, saying he was a reporter conducting a survey who wanted to leave a card at RiverStone reception. Once in, however, Contogouris handed out a card identifying himself as "Special Situations Research

Consultant" with "MI4 Reconnaissance" based in New York. The address on the card was that of his apartment in New York City and the phone number was that of Exis. Contogouris falsely informed these executives that Watsa had sold Fairfax's interest in RiverStone and that their company was no longer a subsidiary of Fairfax in an effort to coerce them to talk. When pressed to back up this statement, Contogouris made a call to his New Orleans attorney and to Lawless (who had since left CFRA to work exclusively for the defendants). Nevertheless, Contogouris returned unable to substantiate his false statements and abruptly left.

120. The next day, June 1, 2006, Contogouris hand-delivered an unmarked manila folder addressed to Fairfax's former CFO Trevor Ambridge (who in fact remained an officer of Fairfax) at the offices of his new employer, Fairfax subsidiary Advent. The envelope contained a letter on "MI4 Reconnaissance" letterhead attempting to induce Mr. Ambridge into providing material non-public information to Contogouris by threat and promise. The letter states in part:

> I will try to make this the most respectful letter I can under the circumstances. No doubt you are aware that these are very critical times for your former employer Fairfax Financial Holdings, Ltd. So I want this to be "fair and friendly" . . . . In this spirit, I am available to meet with you in London at your earliest convenience. I would like to lay out a series of maps, flow charts and related exhibits which I have put together that I feel are missing some critical pieces.

121. To secure Ambridge's help, Contogouris would offer the explicit threat that failure to cooperate would result in Ambridge's criminal prosecution:

> Take just a minute, sit back and try to view what the world will look like for Fairfax and its former officers three years from now given the current level of regulatory scrutiny. Look to the lessons of Enron and most recently of Escala Group (NASDAQ: ESL; I have attached the information at the end of this letter for your reference). . . . I can help by introducing you to a former high-ranking investigator for the U.S. Government who could act as a confidential liaison with current regulators on your behalf to set the record straight and get to the bottom of this. . . . I indulge your attention to a recent witness in the Enron trial testifying that a certain research report led a high ranking executive to say aloud, "they're on to us!" I cannot help to speculate that a similar thought process may have played some part in your decision to move to London. . . . Please help me fill in the blanks. . . . I can be in London at your convenience over the next several weeks with

all of my materials. . . . I will arrive with the aforementioned former Government person who can speak to you with the highest degree of confidentiality."[2]

The letter was signed "Spyro" and indicated in a post-script that he could be reached at "spyromi4@aim.com."

122.    At the direction of Fairfax's counsel and security/investigative personnel, Ambridge responded two weeks later indicating he would be willing to discuss the proposal provided Contogouris committed to not contacting him at work because it could jeopardize his new job. Contogouris agreed to only communicate with Ambridge through his personal e-mail. In addition, Contogouris again made clear that, by cooperating with Contogouris, Ambridge might be able to avoid a criminal prosecution: "We should meet privately and discuss. I cannot guarantee you immunity. However, I can say with some level of confidence that I can introduce you to certain relationships that I have for you to talk to that I can guarantee attorney client privilege confidentiality and that would negotiate a 'queen for a day' (what you say won't be held against you) with the Department of Justice."

123.    Contogouris played up the danger and Ambridge's exposure if he did not cooperate in a follow-up e-mail indicating that he intended to:

> bring a Former Special Agent of the Secret Service and FBI . . . uniquely qualified to communicate to you a depiction of how the government works, as well as, give you a clear perception of the magnitude of the investigation and how your association with Watsa may have made you culpable.  Furthermore, he can explain to you how different intelligence entities are involved in this case and explain the vulnerability of current and  former officers and directors of Fairfax. In addition, he could explain how your cooperation could possibly lead to immunity from prosecution by putting you in touch with appropriate authorities.  Believe me when I tell you it is my best interest to try to insulate you from prosecution.  His

---

[2]      The document to which Contogouris refers is MI4 report on Escala that Contogouris was paid to distribute just as he was the reports he issues on Fairfax and the report likewise nowhere disclosed the financial relationship between Contogouris and the short-selling hedge funds he was promoting by distributing the report in violation of Section 17(b) of the Securities Act of 1933.

experience has been that the person who is first to cooperate usually gets the best deal and gets it put behind him or her.

124.    Contogouris then sent Ambridge an e-mail from "Martin Gardener" to which he requested all future communications be directed. When asked why, he explained the alias was a means whereby he might be able to frustrate subpoenas served on him and avoid having to give truthful testimony concerning his activities: "I do not stay in hotels under any Christian name when meeting insiders at companies. You can use your imagination why. Clearly it leaves my options open in telling my story in the event I am ever subpoenaed. Capisce?"

125.    Contogouris also explained that "What I do for a living is provide highly valuable information to a small group of investment clients" and would "show you why . . . that if authorities go after Prem that certainly he will make you the fall guy. And as such you may want to get the jump on him and consider possible actions and defenses first as I am sure he is the architect of the deceptive dissemination of information" and "had violated U.S. Securities laws." Contogouris again stressed that, in exchange for information from Ambridge, Contogouris would make his former government agent available to help insulate him from prosecution.

126.    An initial meeting was scheduled but then cancelled by Contogouris because of a claimed family crisis. When Ambridge attempted to reschedule the next meeting, Contogouris pressed aggressively to proceed because the defendants by that time had elected to work with a New York business reporter whom the defendants had convinced to do a series of "investigative pieces" that they believed would resurrect and revitalize the tired and unfounded theories other publications had up to that time declined to write about. In order to force Ambridge to meet in time for Contogouris to feed this information to the reporter, Contogouris threatened him by accusing him of being involved in a "criminal fraud," reminding him to "just think what I could do with all your emails," calling his office directly, stating that he intended to "consider all my

53

options as maintaining our confidentiality," threatening that if Ambridge did not immediately cooperate he could "no longer rely on my discretion," should expect to begin receiving e-mails directly at his office, and "will regret it later." When Ambridge objected to such threats, Contogouris told him "you are done" unless he immediately rescheduled. When Ambridge did not respond, Contogouris sent him an e-mail directly to his office from MI4 Reconnaissance that revealed the e-mail name Ambridge had used in their private exchanges with the message "RUN RABBIT Run . . . Check your email George and get back to me."

### 2. The Defendants' June Attempt to Exit

127. Consistent with its plan, the defendants in concert with various trading and broker providers began to manipulate the price of Fairfax stock down in the second half of June through a series of manipulative trading techniques. At the same time, they flooded the market with false statements that Watsa had placed his assets in his wife's name and fled the country, Fairfax subsidiaries were missing cash, the Royal Canadian Mounted Police were about to raid Fairfax's offices, major shareholders were looking to sell their shares, Fairfax had scheduled and then cancelled an investor call about the SEC investigation, Fairfax had attempted a bond offering that failed, and Fairfax had attempted a $300 million equity offering that had failed.

128. These false statements were so intense that major shareholders, trading desks, brokerage houses, rating agencies, and analysts all made alarmed calls to Fairfax seeking answers. Goldman Sachs called Fairfax's bond portfolio managers throughout the day of June 23, 2006, to report that these false statements were causing the value of Fairfax's bonds to collapse. Fairfax's stock likewise plummeted to nearly $90 per share.

129. However, the defendants' efforts failed to shake loose the major shareholders and thereby provide the genuine selling pressure and liquidity to allow the defendants to cover their enormous short position. As a result, the defendants were forced to regroup for another attempt

that they would hope to base on the expected series of tabloid pieces, inside information, sham litigation, and instigated regulatory action.

### 3. Defendants Communicate Falsehoods about Fairfax to the Media

130. As part of that attempt to further depress Fairfax stock, the short-selling defendants communicated their deliberate misstatements about Fairfax to the media and caused a series of falsehoods to be published in the New York Post. Thus, on July 22, 2006, the first in the series of New York Post articles about Fairfax appeared claiming that "[f]ederal prosecutors in New York and the Internal Revenue Service are looking into a series of complex transactions" done in March 2003 that Fairfax purportedly "used to prop up its sagging balance sheet." This assertion was completely false: there was no such investigation by federal prosecutors or the IRS of the March 2003 transaction. The same article falsely reported that Fairfax had previously received "U.S. Attorney's subpoenas," and that "[o]ver the next few months, U.S. prosecutors, and oversea regulators, are expected to issue additional subpoenas on some of [Fairfax's] complicated transactions," thus wrongly implying that U.S. prosecutors had previously issued subpoenas and that there was an on-going criminal investigation of Fairfax.

131. On July 25, 2006, the New York Post published another article about Fairfax, repeating the same false allegations about federal prosecutors and the IRS purportedly investigating the March 2003 transaction.

132. By that time, however, Fairfax was forced to take action to address these escalating attacks. On July 26, 2006, Fairfax and its New Jersey subsidiary filed a complaint in the Superior Court of New Jersey, Morris County, exposing the defendants' racketeering conspiracy to destroy Fairfax's business and to devastate its stock.

133.    Soon after Fairfax exposed defendants' scheme at the end of July 2006, Fairfax stock began to recover its value. Defendants, who still maintained a large short position in Fairfax, were in danger of being caught in what is known as a "short squeeze": as the stock price increases, so does the pressure on short sellers to cover their position or face increasing losses. The ensuing rush to cover produces additional upward pressure on the price of the stock, and also makes borrowing stock more difficult, which then causes an even greater squeeze.

134.    In order to escape from this tightening squeeze, defendants worked to halt the rise of the Fairfax stock price. They orchestrated several more attacks on Fairfax through negative press coverage and a sham lawsuit filed for the sake of negative publicity.

## CLASS ACTION ALLEGATIONS

135.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who sold the securities of Fairfax between December 18, 2002 and July 25, 2006 and who were damaged thereby. Excluded from the Class are:

> defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any defendant or group of defendants has or had a controlling interest.

136.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fairfax shares were actively traded in the United States on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are hundreds, if not thousands, of members of the proposed Class. Record owners during the Class Period and other members of the proposed Class may be identified from records maintained by Fairfax or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice customarily used in securities class actions.

137.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class have been similarly affected by defendants' wrongful conduct in violation of the law, as set forth herein.

138.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

139.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the defendants' actions constitute violations of the United States securities laws;

b.    whether defendants engaged in a manipulation scheme;

c.    whether defendants' statements to the investing public misrepresented material facts about the business, operations, and management of Fairfax;

c.    whether statements made by the defendants misrepresented that certain defendants were providing independent securities analysis when, in fact, their analysis was not independent and was intended to further defendants' manipulative scheme; and

d.    to what extent the members of the Class have sustained damages as a result of defendants' wrongdoing, and the proper measure of those damages.

140.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to

individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET DOCTRINE**

141.    At all relevant times the stock of Fairfax traded in an efficient market that properly digested current information about Fairfax from all publicly available sources and reflected such information in the Fairfax stock price. Under these circumstances, all sellers of Fairfax securities during the Class Period suffered similar injury through their sale of Fairfax securities at artificially depressed prices, and the fraud on the market presumption of reliance applies.

**COUNT I**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5**
**PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

142.    Plaintiff restates the above allegations as if fully set forth herein.

143.    During the Class Period, defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did (i) deceive the investing public regarding Fairfax's business, operations, management and the intrinsic value of Fairfax securities; (ii) cause Plaintiff and the Class to sell Fairfax securities at artificially depressed prices; and (iii) manipulate the market for Fairfax stock.

144.    In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually, took actions set forth herein. Defendants (a) employed manipulative and deceptive devices in connection with the purchases and sales of Fairfax securities; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct that injected false and manipulative information in the marketplace in an effort to cause and maintain

58

artificially low market prices for the purposes of inducing the sale of those securities, including plaintiff and class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

145.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to generate and disseminate false and misleading material information about the business, operations and management of Fairfax as set forth herein.

146.    The defendants employed devices, schemes and artifices to defraud, and engaged in practices, and a course of conduct as alleged herein, in an effort to depress the market price of Fairfax securities through the generation and dissemination of untrue statements of material facts and the omission of material facts necessary to make the statements made about Fairfax and its business operations not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of conduct that operated as a fraud and deceit upon the sellers of Fairfax securities during the Class Period.

147.    As alleged herein, defendants acted with scienter in that they knowingly or with reckless disregard for the truth participated in and furthered a market manipulation scheme by injecting false information into the marketplace in order to depress the price of Fairfax securities; knew that the statements and documents that were issued and disseminated by them concerning Fairfax and its stock were materially false and misleading; intended to and did induce Fairfax shareholders, including plaintiff and the Class, to sell their shares at the artificially depressed prices; intentionally engaged in market manipulation by effecting short sales for the purpose of artificially depressing the price of Fairfax securities; intentionally or recklessly violated SEC

rules and regulations governing short sales; and were aware of the fraudulent, market-manipulating nature of their acts and the potential for their own individual profit from those acts.

148.    As a result of the dissemination of materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Fairfax securities was artificially depressed during the Class Period. Relying upon the integrity of the market in which the securities trade, plaintiff and the other Class members sold Fairfax securities at artificially depressed prices and were damaged thereby.

149.    At the time of said misrepresentations and omissions, Plaintiff and the Class were ignorant of their falsity and believed them to be true.

150.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

151.    Defendants' wrongful conduct alleged herein directly and proximately caused the damages suffered by plaintiff and the Class. During the Class Period, plaintiff and the Class sold securities of Fairfax at artificially depressed prices and were damaged thereby. Defendants' injection of false information about Fairfax into the marketplace and their short-selling activities were integral to their market manipulation scheme. Through their manipulative scheme defendants depressed the price of Fairfax stock and induced plaintiff and the Class to sell securities of Fairfax at depressed prices, causing them to suffer damages thereby.

## COUNT II
### (For Violation of Section 20(a) of the 1934 Act Against Defendants Cohen, Sender, Heller, Rocker and Loeb ("Individual Defendants")

152.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

153.    The Individual Defendants acted as controlling persons of their respective defendant companies, as stated above, within the meaning of §20(a) of the 1934 Act as alleged

herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of their respective defendant companies' manipulative scheme and/or intimate knowledge of the false statements disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of their respective defendant companies, including the stock market manipulation of the Fairfax securities alleged herein and the content and dissemination of the various statements which plaintiff contends are false and misleading.

154. In particular, each of these Individual Defendants had direct and supervisory involvement in the day-today operations of their respective defendant companies, and, therefore, is presumed to have had the power to control or influence the actions of their respective companies that give rise to the securities violations as alleged herein, and exercised the same.

155. As set forth above, Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their sale of the Fairfax's stock during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of plaintiff and the other Class

members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    D.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial of all issues so triable.

Date: February 7, 2007

SEEGER WEISS LLP

By: _____
Christopher A. Seeger, Esq. (CS-4880)
Eric T. Chaffin, Esq. (EC-0585)
Roopal Luhana, Esq. (RL-3958)
One William Street
New York, NY 10004
Tel: 212.584.0700
Fax: 212.584.0799

*cseeger@seegerweiss.com*
*echaffin@seegerweiss.com*
*rluhana@seegerweiss.com*

*Attorneys for Plaintiff*

## CERTIFICATION OF EDGAR HOLOMON IN SUPPORT
## OF CLASS ACTION COMPLAINT AGAINST DEFENDANTS S.A.C. CAPITAL
## MANAGEMENT, *ET AL.*

Edgar Holomon ("Plaintiff") declares, as to the claims asserted under the federal securities laws in the complaint prepared by counsel in the above case

1. Plaintiff has reviewed the Complaint and authorized its filing.

2. Plaintiff did not purchase the securities that are the subject of the Complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the proposed Class Period plaintiff: purchased 21 shares of Fairfax Financial Holdings Limited securities between April 2003 and December 2004; and sold those 21 shares at $145.64 on November 16, 2005.

5. In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _7_ day of February, 2007.

By: _____
    **Edgar Holomon**